We'll now proceed with Appeal 24-2931, United States v. Town of Thornapple, and we'll begin Thank you, Your Honor. May it please the Court, Nicholas Wannick on behalf of the appellants in this matter, the Town of Thornapple. Your Honors, we are here for one simple question today, to answer what on God's green earth a voting system is under the Help America Vote Act of 2002. But the real issue here is that the government, in its infinite wisdom, has decided to expand the meaning of voting system to such breadth that the statutory text has literally no meaning left. I think it's important to understand that what has happened here is that the government has taken this statute and tried to harangue and sort of fit what exactly a voting system is to match its definition to justify its underlying action here. So, Mr. Wannick, my understanding is that the town uses a paper ballot system, right, for voting. Correct. A paper ballot system that is then hand-counted. Now, it is the government... Hold on. So it's a paper ballot system that after the vote is taken is placed into the locked box and then it's later hand-counted. Is that correct? Correct. So the question is whether or not a paper ballot voting procedure like that one could be defined as a voting system, I take it. That's right. And so I know that you delve into the definition of voting system and the various arguments that both sides make, but I also noticed that the statute contains this phrase, paper ballot voting system, right? And so in my mind, just looking at it from a purely textual basis, paper ballot seems to be an adjective phrase modifying voting system, much like a red car, red would be the adjective modifying car. So why doesn't that just end the case? A paper ballot voting, a paper ballot procedure is a type of voting system, which is how to make most sense of the phrase paper ballot voting system. Why is that wrong? Well, Your Honor, I think it underlies some of the confusion when you look specifically at that portion of the statute. I think if you look in the broader context, what you'll see is when we define voting system, we're first starting with the electronic, the mechanical and electromechanical systems that are being employed. Now, but if the question is what did Congress intend by voting system and actually the specific question is whether Congress intended paper balloting to be a type of voting system, the phrase paper ballot voting systems seems to address that head on, doesn't it? No, Your Honor, I don't think it does. And I think, well, then if, if the voting system does not encapsulate or include a paper ballot system, what, what sense, what definition would you give to paper ballot voting system? Your Honor, it may be a voting system, but it is not a voting system for the purposes of the requirements that a voting system must meet under the statute. But the, but that phrase is within the same statute. And so you're relying upon the definition of quote unquote voting system that's in the statute. And certainly Congress must have at least within the same statute intended the same words to mean the same thing. I think they do mean the same thing, Your Honor, in terms of it, it might be a voting system in the colloquial sense, but not in the statutory sense under the language of the statute. Then you're saying that Congress is using two different definitions of voting system, right? Here, Congress defined voting system and then use that phrase throughout the statute. So I, again, I'm coming, trying to figure out, you know, if we apply the definition in 21081B voting system defined, and then we apply that to paper ballot voting system under your theory, then that's, that phrase would be nonsensical. No, Your Honor. I don't think it's nonsensical. I think it, well then what would it mean? Your Honor, I think it's just separate to recognize that in fact, municipalities may be using a quote unquote paper ballot system, but that's not what HAVA is. It doesn't say paper ballot system. It says paper ballot voting system. Correct, Your Honor. Right. But I think it's important to understand where voting system defined comes in the greater context of HAVA. This is in title three. So we're in section 301. HAVA is at its core, and we can go ahead and look at exactly the first sentence of the act. To establish a program to provide funds to states to replace punch card voting systems. That's really what HAVA was about. And I know that both sides in here have pointed to the congressional record. I don't think we have to go that far. I think the statute itself is clear enough. Mr. Wannick, let me interrupt you because part of the decision we've got to make based upon the statute 2108.1.3.B is whether the and between subsection B.1 and B.2 should be deemed conjunctive or disjunctive. As I understand your argument, you're saying that the and should be conjunctive. Wouldn't that present real challenges for the rest of subsection one and subsection two, that every time the word and is used, it's in the conjunctive? No, I don't think it does, Your Honor. And I think if you're going to look specifically to the next sentence that comes after, we're looking at the practices and associated documents used. Let me interrupt you there. So then if the and after 1C and the and after 2D mean the same thing as the and after 1D, so if it all means conjunctive, then a voting system would have to meet all the characteristics in B.1 to qualify as a voting system. And doesn't that upend the way the statute is defining a voting system? No, Your Honor. I don't think it does because this again turns back to what are the voting systems that HABA is trying to address here. This was not meant to be a sort of nationwide blanket regulation that applied to every voting system that one could conceive of. This was to make sure that when we're replacing dimpled chads and all the other things that went wrong with the 2000 election, we were making sure that the machines that Congress is spending a lot of money on at that time, that those meet the requirements, that these new systems that are being rolled out are not going to leave elderly and disabled voters still unable to effectively cast their ballots. Let me ask you a real pragmatic question. There was an area of Thorn Apple's voting area for disabled, those who were disabled. Correct. There was not a machine there, or at least a functioning machine. We know that from the Webster Declaration, correct? Correct. Subsequent to the town of Thorn Apple's June 2023 decision when they stopped employing that machine. So if a working machine had been present at that location, then the town would not have been allegedly in violation of the statute, correct? As I understand the government's position, yes, that is correct, Your Honor. This is simply a matter of the government trying to return use of this machine, and I don't really want to get into the irreparable harm prong. I know that's been well briefed, but the city made this, or the town rather, made this decision for a reason, and part of that consideration was the financial burden, and that's in the record. Mr. Wanna, can I go back to Judge Brennan's question, please? I want to make sure, I think you were agreeing with the premise of his question, that if the and after 1D in Section 301 is conjunctive, that every other and in Section 301 has to be conjunctive as well. Did you agree with the premise of that question? Yes, I agree, and I think that tracks logically. When we're talking about what a voting system is, some of these other requirements don't seem to make much sense if you're not employing an electromechanical system. If you're not using one of those things, D, to determine specific system changes to be made, that seems a little jargony for the purposes of a paper ballot that's then going to be hand-counted. Does the record reveal whether or not a printer was used to create the ballots? I do not believe the record reveals that. Would that satisfy the mechanical if a printer was used to make the ballots? Possibly, Your Honor. I think it would. And how do you explain the inclusion of paper ballots in 2E to make available any material to the voters? Well, I think that goes kind of to Judge St. Eve's question of how are the ballots themselves being made available. Again, the record is not entirely clear on exactly what happens when you walk into one of these polling places, especially after the decision, but perhaps you have to sign in on a computer to sign the voter roll. I don't know what processes they are employing. I just know that they have not been using this machine. And so, with my remaining time, I do want to reserve rebuttal. That's fine. We're going to give you more time on rebuttal. Did you have any further questions, Judge Eve? I did. With regard to the—I just wanted to make sure that I understand your position with regard to the irreparable harm prong. So, as I understand it, the testimony of Ms. Pinnow is that when someone is unable to fill out a ballot themselves because of a particular disability that she assists them in filling it out, right? Correct, Your Honor. There are three specific examples from the record. Now, one of them is not actually Ms. Pinnow assisting. It's noting that the daughter of a blind woman did assist her. But I'm glad you brought that point up because I think it's important to note that the Court's decision below really was reaching out and saying that the whole point of this is not that we need to make sure this machine is here. It's that we need to make sure that this machine is here so that everybody has access to the secret ballot to vote sort of on a level playing field. And I think that is a completely unworkable standard here. I don't think there is a piece of technology on this planet where you can possibly allow everyone to vote on an equal basis. I don't think an amputee could, for example, use these machines. And if you're going to go with the logic of the Court below and the government's position that a voting system is whatever system the municipality is using, it's a direct quote from the trial court, you're going to find that the types of assistance that are guaranteed elsewhere in our federal laws under the ADA and the state to provide that assistance because they're worried about this new over broad interpretation of HAVA which has not been present in nearly 20 years that HAVA has been around. Well, I guess my question is a bit more targeted on the record than that. The statute talks about the, when it talks about accessibility for individual disabilities, that the system has to provide the same opportunity for access and participation including privacy and independence. So I'm just looking at the privacy part. How would you define privacy as used in the statute? I think privacy means that you are casting your ballot in a manner that no one else is aware of how you've chosen to cast that ballot. And again, I don't think that is feasible when we're talking about certain categories of disabled voters. Okay, thank you. We'll give you some rebuttal time, Mr. Wannick. Mr. Wang will now recognize you for argument on behalf of the appellee. May it please the court, Christopher Wang on behalf of the United States. The district court's order granting a preliminary injunction should be affirmed. The court correctly determined that the United States is likely to succeed on the merits of its HAVA claim and did not clearly err in finding that the United States is likely to suffer irreparable harm absent injunctive relief. Mr. Wang, it's not the clearest interpretation with regard to the use of the word and, the conjunctive disjunctive. Is it the government's position that the and that occurs after B1D should be interpreted disjunctively versus the and at the end of B1C and 2D? Those should be interpreted conjunctively. Our position is that they should be interpreted disjunctively everywhere in B1. Let me pose a similar question to you, Mr. Wang, that I posed to Mr. Wannick. If the machine had been operable and in the area of the voting municipal hall, reserved for individuals who are disabled, that option enough would have been sufficient to satisfy the law, is that correct? That's correct. The option to give individuals with disabilities the right to vote with privacy and independence, that would be sufficient. Assuming it was operable and we know from the Webster affidavit that the machine was not present, is that correct? During the elections that issue, April and August 2024. Part of the challenge that we have here is on the irreparable harm component. The record seems to be somewhat thin, somewhat underdeveloped. We've got the Webster affidavit, we've got the statistical information that's coming in from the attorney, and then we have the pinout testimony, which Judge Peterson found very credible. We weren't there, obviously, but from the transcripts, she seems to have been on top of things. With those three things, do we have enough to know that there was a harm to the town that would have satisfied the standard? Yes, Your Honor. Again, I'd like to remind this Court that this is a clear error standard of review. Based upon the evidence, the demographic evidence of individuals with disabilities in Wisconsin, and the two specific instances of individuals who needed assistance to vote, the District Court did not clearly err in concluding that Thornaple has individuals with disabilities who need assistance in voting. Defendants' failure to provide an accessible voting machine is likely to irreparably harm the fundamental right of these individuals to vote privately and independently. Once again, I'd like to emphasize that there's a fundamental right to vote privately and independently that HAVA guarantees, particularly given that this population can fluctuate between elections and anyone can become a member of this demographic at any time. For example, you could have a stroke, you could get into an accident that blinds you temporarily or permanently, and you could need to use an accessible voting machine. That's certainly a distinguishing argument. The elephant in the room here, though, is we've got an 800-person town with 400 voters. Ms. Pinnow says there's zero to one disabled. I think the record shows maybe one to two disabled. The statistics are interesting background, but why does the government have the interest in this particular case? The government has a basic interest in enforcing HAVA wherever it's violated. Thornaple's argument is basically that the United States has to show actual harm. The standard is likely harm, not actual harm or harm that is certain to occur. And you're relying on the Whitaker case, our Whitaker case for that? Yes, Your Honor. And Pinnow's testimony that zero to one disabled individuals attempted to vote in Thornhill actually supports the government's case because it's an acknowledgement that in certain years, at least one individual who was disabled required assistance to vote. Your Honor, if I would like to turn back to the likelihood of success on the merits, if I could. Judge Lee is exactly right that Section 301 explains how paper ballot voting systems can satisfy the statute's requirements that voters be given the opportunity to correct overvotes and voting errors before a ballot is cast and counted. These provisions necessarily assume that such a system is a voting system under Section 301B. Defendants do not attempt on appeal to explain these provisions, and this omission is fatal to their argument. Defendant's argument fails for several additional independent reasons. As Judge Lee pointed out, a pencil used to mark a ballot and a lock used on a box to store ballots securely are both mechanical devices that fall under B1. Second, in terms of Judge Brennan's argument about the meaning of the word and, we believe that the best interpretation of this section is that Congress listed all potential components of a voting system in Section 301B indicating that the word and connecting B1 and B2 is a disjunctive. Congress intended to capture all important aspects of the voting process, including before, such as inspection and testing, the actual vote, and after, audit the actual vote. That might not be covered by the general phrase, whatever voting system a municipality uses, as Thornapple proposes. I'm having difficulty reconciling your earlier answer, though, that if the and at the end of 1C is also to be disjunctive, and the and at the end of 2D is also to be in the disjunctive, just like the and at the end of 1D, joining the two, if those are all to be disjunctive, doesn't that create a problem for our reading of B1 and B2? I don't think so, Your Honor. B1 is supposed to address the equipment that possibly could be used in the voting system that might not necessarily be used, if you're basically accepting Thornapple's argument that they don't have any mechanical equipment. So it could be A, B, and C, but wouldn't necessarily satisfy D, but that's okay under Harvard? That is okay. I'm looking at the word combination in B1, the total combination of mechanical, electromechanical, or electronic equipment. That implies that a voting system does not necessarily have to include 1A, B, C, and D. A third reason not to accept... Mr. Wang, I want to go back to the lock comment. The district court, as you acknowledged, focused on the lock on the voting box, qualifying as a mechanical requirement. It seems kind of odd to me that Congress would intend that whether or not there's a lock or not would be a dictating factor for voting. Well, Your Honor, we don't have any legislative history indicating what Congress thought mechanical meant. I understand that, but common sense that whether or not you have a lock on a lock box is going to dictate whether it's mechanical? Your Honor, I think it's certainly a colorable argument. That's why we made it in our brief. It's just one way to affirm the judgment of the order of the district court on this particular factor. There are several other independent reasons. If you don't accept the argument that a lock on a lock box is mechanical, there are all these other arguments that we set forth in our brief. Is there anything in the record about how the ballots were printed, how they came about? Was a printer used for them? I don't know if there was. I think certainly if a printer was used, that would satisfy B-1 in terms of because it's a mechanical device that's used to actually print the ballots, but I don't know if the record indicates how the ballots were printed. The third reason that I would say that supports the government's position as defendant's interpretation would leave a gaping hole in Section 301's coverage. Section 301 sets forth uniform standards for correcting overvotes and voting errors as well as providing the same opportunity for access and participation to all voters. Defendants provide no reason to apply these requirements to all methods of voting other than paper ballots. I know the Defendant's Council brought up the issue of the ADA and the Voting Rights Act providing sufficient coverage to protect individuals with disabilities. Certainly federal statutes can provide overlapping coverage. There's no canon of statutory construction that requires a court to interpret two federal statutes in a way that they cannot overlap in coverage. In this case, HAVA requires an accessible voting machine be available and ready to go at every polling place without exception. And the ADA does not address other Section 301 uniform requirements applicable to voting systems such as the ability to correct errors and overvotes before a ballot is cast and counted. And I guess with the limited amount of time I'd have, I'd like to address opposing counsel's argument that HAVA was intended only to apply to the problems with the 2000 election, specifically punch cards. Although that's certainly a reason for Congress to have passed HAVA in 2000, there's no indication that Congress intended for HAVA to apply only to those mechanical systems. In fact, HAVA's preamble states that it was intended to establish minimum election administration standards. And Title III itself indicates that it was to establish uniform election administration requirements. So certainly that indicates that it applies to paper ballots, mechanical types of voting. Your Honor, I see that my time is up. There was no mandatory mediation here with the magistrate because it was one week between the complaint and the hearing, correct? I don't know why it was. I know that it was a very abbreviated schedule because of the November 2024 election. Thank you, Mr. Wang. We'll now move Mr. Wannick to you for two minutes for rebuttal. Your Honors, the only real point I have on rebuttal is that I still feel even at this stage of the case, after we've been through the district court, we've now briefed this issue with repeated pleadings from both sides, and we're now here arguing today, is I still do not understand how the government can stand here and say that a meager pencil that they hold in their hand is a voting system under HAVA. I think what you heard from counsel shows just how far they're willing to go to expand that language to cover something that Congress never intended to. And I think this goes to Judge Saney's point. When you brought up the fact that a mechanical lock wasn't really what Congress had intended, I would even go further, and I would say that I don't know why the voter would have any interaction with the lock to begin with, because I think we'd have bigger election integrity problems if that were the case. So this really stands, and the government pointed out on page 20 of its brief, it said that a pencil is a mechanical device. It's really what this case boils down to, and I just do not think that the statute itself, the legislative history, or quite frankly any workable standard that this court could provide in terms of how to manage elections moving forward, I don't think any of that supports using such a low threshold to grant the government jurisdiction to seek the injunction that it did in this case. And then I will turn over to your questions. Thank you, Mr. Wannick. Thank you, Mr. Wang. The case will be taken under advisement. Thank you, Your Honor.